[Cite as *Roubanes v. Roubanes*, 2021-Ohio-4493.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Barbara A. Roubanes (nka Luke), | : | |
| Plaintiff-Appellant, | : | No. 20AP-382 |
| | | (C.P.C. No. 08DR-2851) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Matthew G. Roubanes, | : | |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on December 21, 2021

**On brief**: *Dennison Law Office*, and *Sallynda Rothchild Dennison*, for appellant. **Argued**: *Sallynda Rothchild Dennison*.

**On brief**: *The Nigh Law Group LLC*, *Joseph A. Nigh*, and *Courtney A. Zollars*, for appellee. **Argued**: *Courtney A. Zollars*.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations

NELSON, J.

{¶ 1} Plaintiff-appellant Barbara A. Roubanes, nka Luke ("Ms. Luke"), centers this appeal on the premise that her across the board loss in her last appeal (one of many visits here in the course of this contentious post-divorce case) somehow vindicated her position that defendant-appellee Matthew G. Roubanes ("Mr. Roubanes") had "committed fraud" in the matter. It didn't: there was no such legal vindication. The premise doesn't hold, and the trial court's very thorough decision stands.

{¶ 2} "The central issue in this appeal is whether the trial court should have applied an available remedy after finding that [Mr. Roubanes] committed fraud when providing his income information, thereby affecting all future child support calculations as well as other,

later orders," Ms. Luke tells us. Reply Brief at 2. But the trial court's earlier finding of fraud on the court (a finding made by a predecessor trial judge) was overturned on appeal, and the trial court's earlier rejection (as untimely pursuant to rule) of other claims of fraud on Ms. Luke herself was upheld. *Luke v. Roubanes*, 10th Dist No. 16AP-766, 2018-Ohio-1065, ¶ 41. Against that backdrop, the trial court then was correct in observing that because the fraud on the court determination "was reversed in its entirety, there is no standing finding in the record (i.e., law of the case) that the Defendant committed fraud." July 7, 2020 Decision and Judgment Entry Including Findings of Fact at 16, ¶ 87 (further reciting that "*both* parties' business record keeping and tax records * * * lacked organization and clarity from the start of this case"; noting that the record contained insufficient evidence or findings of now long-ago income (as opposed, perhaps, to bank deposits) to establish fraud; and that in any event, "issues of each party's 2008 and 2009 'income' for purposes of determining either's child support obligations was not (and can no longer be) before the Court" with regard to its determination of matters from 2014 forward)(emphasis in original).

{¶ 3} Because the trial court has done what once might have been called yeoman's work in sorting through and distilling the lengthy history of this divorce action, evaluating live testimony, and producing a resolution consistent with law in effort to bring matters to a proper conclusion, we need not reiterate all of what the trial court has set forth. Instead, after a somewhat truncated overview, we will parse our last decision a bit in order to address Ms. Luke's primary concern that the trial court did not faithfully observe legal determinations already settled, and we then will try to be succinct in assessing her secondary concerns.

{¶ 4} The trial court's July 7, 2020 decision from which Ms. Luke appeals may have been understated in observing that "through the entirety of [the then] 12 years of (almost) non-stop litigation, this case has run high on emotion and been agitated with conflict." Decision and Judgment Entry at 2. After tracing the applicable law, it recounted Ms. Luke's 2008 filing for divorce, noted that the parties have two children together (one born in 2001 and the other in 2003), and recited that the couple was divorced through a 2009 agreed judgment entry that came after some 13 months of discovery and a "summary trial" involving stipulations showing that "both part[ies'] respective incomes [were] significantly

more than had been represented by <u>either</u> party in sworn affidavits previously filed with the Court." *Id.* at 7-8, ¶ 1-5 (emphasis in original).

{¶ 5} At the time of that settlement, "each party proceeded on a pro-se basis. At all times throughout the process [Ms. Luke] was a licensed practicing attorney." *Id.* at ¶ 6. The parties agreed at that point to Ms. Luke's child support obligations, effective August 1, 2009, although Ms. Luke "continued in her previously established pattern of not fully/timely paying child support pursuant to Court orders." *Id.* at ¶ 8-9. Litigation quickly ensued with competing motions to recalibrate or enforce parental responsibilities; in 2012, Ms. Luke was found in contempt of court by agreed entry, and child support later was modified without appeal. *Id.* at 10-19. But that did not resolve the flood of motions and proceedings.

{¶ 6} In 2013, for example, Mr. Roubanes filed a motion asking the court to hold Ms. Luke in contempt for having failed to pay $750 in attorney fees that had been awarded February 20, 2013. *Id.* at ¶ 32. That same year, Ms. Luke moved to have Mr. Roubanes named obligor. *Id.* at ¶ 36. In 2014, this court on appeal remanded the case for recalculation of child support. *Id.* at ¶ 37; *see also Roubanes v. Roubanes*, 10th Dist. No. 13AP-369, 2013-Ohio-5778, ¶ 21. On July 25, 2014, Ms. Luke filed her Motion to "change residential parent, for a modification of Child support, and to terminate her support obligation": the parties agreed to an amended shared parenting plan, but Ms. Luke's motion to modify child support needed to be decided by the court. July 7, 2020 Decision at ¶ 40.

{¶ 7} And motions to the trial court kept coming. In 2015, Ms. Luke filed a Civ.R. 60(B) motion for relief from judgment as predicated on Mr. Roubanes's "misrepresented financial information." *Id.* at ¶ 50 (capitalizations and emphasis deleted). By entry of October 14, 2016, the second to last trial judge to act on the case granted that motion, finding that Mr. Roubanes had committed fraud on the court in failing to disclose income from 2008 and 2009: the trial court released Ms. Luke from the earlier child support orders, but made no findings as to what the parties' actual incomes had been. *Id.* at ¶ 52. As we will discuss at greater length below, the parties cross-appealed and this court ruled against Ms. Luke. *Luke*, 2018-Ohio-1065. (Ms. Luke had remained obligated on child support orders and attorney fee awards because the trial court had granted a motion to stay the 60(B) ruling pending the outcome of the appeal. July 7, 2020 Decision at ¶ 56-57.)

{¶ 8}   After this court ruled on that (then) latest appeal, the case returned to the trial court, now under the auspices of the current trial judge. *Id.* at ¶ 55, 62. The parties "agreed to extend [Magistrate-appointed forensic accountant] Rebekah Smith's determination of the parties' incomes [from 2013 and 2014] to 2015 through 2018." *Id.* at ¶ 49, 65. Given "ongoing apparent communication and discovery disputes," the trial judge found it necessary to set monthly status conferences to ensure that Ms. Smith could complete her work; untimely or sporadic appearances by Ms. Luke and her counsel, however, rendered those conferences "problematic." *Id.* at ¶ 66. Ms. Luke also "failed to appear" for a deposition. *Id.* at ¶ 78. This was all during a time of very serious health difficulties for the parties' younger child (whose situation thankfully turned out well after a significant battle), and for Ms. Luke's mother (who also acted as her bookkeeper and who sadly is now deceased). *Id.* at ¶ 68, 80-81, 83.

{¶ 9}   On August 15, 2019, the parties entered into an amended shared parenting plan under which Mr. Roubanes remained the named residential parent for school placement purposes. With the exception of Monday evening parenting time for Ms. Luke, "the parenting schedule remained with [Mr. Roubanes] scheduled to have 8 days (57.2%) and [Ms. Luke] scheduled to have 6 days (42.8%) out of every 14 days"; summer breaks were evenly divided. *Id.* at ¶ 84.

{¶ 10} Turning to the relative earning abilities of the parties, and assisted by Ms. Smith's reports, the trial court noted that Ms. Luke's three-year income average (2016-2018) was $745,995 and that her four-year average (2015-2018) was $563,983. *Id.* at ¶ 103-04. But the trial court also found those numbers affected by lawyer Luke's having received in 2018 a "onetime, non-recurring" counsel fee of $2,574,687.50 for a personal injury case with which she was professionally associated: "this income," the trial court concluded, "should not be used as on any kind of averaging for purposes of income within the child support guideline worksheet. It should, however, be considered for purposes of [Ms. Luke's] overall earning ability and when determining child support obligations for incomes of over $150,000 pursuant to law. * * * * [Her] 2018 success demonstrates an earning potential far in excess of what [she] has been earning as an attorney and the resultant enhancement of her professional reputation is likely to impact her earning potential in the future." *Id.* at ¶ 105.

{¶ 11} Mr. Roubanes, the trial court continued, is a UPS employee with a three-year average income (2016-2018) of $74,247 and a four-year average (2015-2018) of $70,564. *Id.* at ¶ 108-09. Ms. Smith looked into suggestions by each party that the other might have had additional income for those years, and non-wage deposits were reconciled or factored into their respective incomes. *Id.* at ¶ 111. The trial court found "no evidence" that a 2013 real estate transaction involving Mr. Roubanes provided him any additional income for child support purposes, and specified that "[c]hild support is not being modified for any time periods before July 25, 2014" (the date on which Ms. Luke moved to modify child support). *Id.* at ¶ 112.

{¶ 12} Reviewing the parties' employment history, the trial court observed that Ms. Luke's "professional resume is impressive" and reflects "extensive experience" and "professional accolades." *Id.* at ¶ 113. The court further noted that Ms. Luke had been in an automobile accident in 2001 and suffered a traumatic brain injury, after which her then-employer noticed a diminution of organizational skills, a growing "combativeness," and a loss of some self-confidence; she " 'would have good days and bad days.' " *Id.* at ¶ 124-30, 142. Nonetheless, the trial court found the evidence showed that "when her distractions were managed" in the year or two after the accident, she still could perform at a high level. *Id.* at ¶ 131. Three years after her accident, in 2004, Ms. Luke was named an "Up and Coming Lawyer" by *Ohio Lawyer's Weekly*. *Id.* at ¶ 134. Ms. Luke has focused on family law in a solo practice for the last many years "and holds herself out as an attorney who handles cases involving domestic family law matters, child custody cases, guardian ad litem [work,] and personal injury." *Id.* at ¶ 139-40. The trial court extensively outlined and assessed the medical evidence regarding the nature of the car crash injuries and of certain continuing effects, and the trial court also evaluated vocational expert testimony, *id.* at ¶ 143-84; it also reviewed Ms. Luke's earned income history (including her stipulation that in 2009, her income for child support guideline purposes was $75,520), *id.* at ¶ 185-87. And the trial court reiterated its view that the win for which Ms. Luke garnered her two and a half million dollar fee would burnish her reputation, as it was "one of the largest verdicts for 2018 in the country." *Id.* at ¶ 191.

{¶ 13} After considering the relevant evidence, the trial court concluded that for the years after 2013, Ms. Luke was voluntarily underemployed in any year in which she did not have an income of at least $93,103; for child support purposes, it imputed that level of

income to her for the years 2014 through 2020. *Id.* at ¶ 195-96. The trial court also found and factored in that Mr. Roubanes had been voluntarily underemployed during 2013. *Id.* at ¶ 197-98. Other trial court findings included that the parties' older child had resided with Ms. Luke since six weeks or so before his emancipation, and that Ms. Luke had failed to provide sufficient evidence to show that a foster child in her household qualified her for a resident child adjustment. *Id.* at ¶ 199-200.

{¶ 14} The trial court then independently calculated child support from 2014 into 2019 (for both children through the older child's emancipation on June 9, 2019) and thereafter with regard to the younger child. *Id.* at ¶ 208, 216-24. The trial court declined to order a downward deviation from the basic schedule worksheet for 2014 through July 2019, but determined that a deviation for the younger child for 2019 was appropriate. *Id.* at ¶ 225. The trial court also noted that the parties disputed how much time the children had spent with Ms. Luke, determining: Ms. Luke's "testimony as to the extent of time with the children throughout the relevant period is found not to be credible." *Id.* at ¶ 225(d) (citing to some specifics). All things considered, the trial court found, "it is clear that for the relevant time period through April 2019, [Mr. Roubanes] had extended (almost exclusive overnight) parenting time with [the older child] and had the greater percentage of time with" the younger child. *Id.*

{¶ 15} Ms. Luke has remarried, the trial court noted, and shares living expenses with her husband. *Id.* at ¶ 225(h). She has used part of her two and a half million dollar legal fee to "upgrade her law office and purchase personal and business real estate for [large sums of] cash * * *." *Id.* at ¶ 225(k). Assessing Mr. Roubanes's living circumstances, the trial court found: "As a result of [Ms. Luke's] failure to pay child support and the financial struggles, [Mr. Roubanes] was unable to maintain the marital home. He was rendered (practically) homeless with the purchase of a barn which he has since remodeled into a home for the children and himself." *Id.* at ¶ 225(l).

{¶ 16} The trial court further found that Mr. Roubanes "proved by clear and convincing evidence that [Ms. Luke] failed to comply with prior orders of the Court to pay attorney fees as awarded. The parties stipulated that there was a [$806.12] balance owed. [Ms. Luke] did not prove by a preponderance of the evidence her inability to pay." *Id.* at ¶ 228, 232. The trial court also found that Ms. Luke had "failed to pay child support as

previously ordered by the Court," and noted the earlier contempt finding against Ms. Luke. *Id.* at ¶ 228-30.

{¶ 17} Among other attorney fee findings, the trial court concluded that Mr. Roubanes had spent $20,670 in prevailing on the last appeal and cross-appeal, and at least $6,000 in contesting the 60(B) motion at the trial level. *Id.* at ¶ 238-39. Mr. Roubanes further incurred fees of $650 fending off an unsuccessful attempt by Ms. Luke to obtain through a West Virginia court "discovery relative to her matters being litigated in Franklin County, Ohio." *Id.* at ¶ 255. The trial court also stated: "Despite ultimately being reassured by the Guardian ad Litem that [Mr. Roubanes's] home was appropriate for the children, having the children's current wishes confirmed by the [GAL] and having a recommendation by the [GAL], [Ms. Luke] continued to contest the non-financial matters of the allocation of parental rights until mid-2019." *Id.* at ¶ 256. The court also noted that Mr. Roubanes had incurred another $73,127 in attorney fees for various matters, some (specified amounts) of which were for disputes on which Mr. Roubanes did not prevail. *Id.* at ¶ 234-36.

{¶ 18} The trial court addressed Ms. Smith's costs as the court-appointed expert, too. Ms. "Smith testified that she had an inordinate amount of difficulty and delay obtaining necessary documentation from [Ms. Luke]"; Ms. Luke's "actions (or inactions)," defended in part as arising from the ill-health and then death of her mother, the bookkeeper, as well as from her daughter's illness and the demands of solo legal practice, "directly [contributed] to an increase in [Ms.] Smith's fees." *Id.* at ¶ 258-61. (In the end, however, the trial court directed the parties to bear equally Ms. Smith's fees for preparing for and participating in the trial. *Id.* at ¶ 283.)

{¶ 19} Having analyzed the case in much greater detail than we recount above, the trial court issued a variety of final orders. They included: a determination of Ms. Luke's child support arrearage as of May 1, 2020 to be $30,473.70 (to be paid in $60 monthly increments until the younger child's emancipation, and thereafter at $367.20 per month until liquidated); establishing Ms. Luke's child support obligations for the younger child to be $306 per month effective June 9, 2019; and a requirement that Mr. Roubanes maintain health insurance for the then-unemancipated child. *Id.* at ¶ 268-76. The trial court also adjudicated Ms. Luke to be in contempt of court for having failed to pay the balance of attorney fees already ordered, with a seven-day jail sentence stayed to permit prompt

payment and with a further $600 awarded to Mr. Roubanes for fees on the motion. *Id.* at ¶ 277. The trial court additionally granted Mr. Roubanes's motion to find Ms. Luke in contempt for having failed to pay previously ordered child support, and imposed a ten-day jail sentence stayed to permit Ms. Luke to pay Mr. Roubanes $2,500 in fees for his lawyer's work on the motion and to begin liquidating the child support arrearages pursuant to the specified schedule. *Id.* at ¶ 279 and July 7, 2020 Judgment Entry correcting typographical error. And the court granted various motions of Mr. Roubanes for attorney fees, totaling another $77,170. *Id.* at ¶ 280-82. In the course of its decision, the trial court also had made rulings that included denying Ms. Luke's 2013 motion to name Mr. Roubanes as obligor, *id.* at ¶ 36, granting to the extent specified Ms. Luke's requested modification of child support, *id.* at ¶ 40, and denying her motion to terminate child support, *id.*

{¶ 20} The trial court also effectively denied Ms. Luke's 60(B) motion, the grant of which had been reversed in the last appeal. *Id.* at ¶ 87 ("As indicated by the Court of Appeals, [Ms. Luke] is without legal recourse to review those previous orders as the time is past for relief for fraud on the person. * * * * Without * * * evidence or formal findings of income, this trier of fact cannot make a finding that there has been fraud committed by [Mr. Roubanes]") (emphasis omitted). *Compare, e.g.*, *Mariner Fin., LLC v. Childs*, 10th Dist. No. 21AP-19, 2021-Ohio-3935, ¶ 10 ("When a trial court does not expressly rule on pending motions upon entering final judgment, this court deems those motions implicitly denied") (citation omitted).

{¶ 21} Ms. Luke now posits four assignments of error:

> I. The trial court erred and abused its discretion by reinstating Appellant's child support obligation after previously finding appellee committed fraud.

> II. The trial court erred and abused its discretion in calculating Appellant's child support obligation using the worksheets attached to its 2020 decision.

> III. The trial court erred and abused its discretion by ordering Appellant to pay attorney fees to Appellee, and for not ordering Appellee to pay Appellant's attorney fees.

> IV. The trial court erred and abused its discretion in finding Appellant in contempt.

Appellant's Brief at 1 (capitalizations and bolding adjusted).

{¶ 22} Ms. Luke devotes the bulk of her argument to her first assignment of error. *See id.* at 9-40. And although she divides that argument into various subpoints, all hinge on the assignment's stated proposition that the trial court erred in not hewing to a "previous[] finding" of fraud. *See* Assignment of Error I; *see also, e.g.,* Reply Brief at 2 ("The central issue in this appeal" is what the trial court should have done in light of its earlier finding of fraud); Appellant's Brief at 14, 17, 19 (arguing fraud as a pre-established underlying fact), 38 ("with fraud already proven"). That proposition rests on a misunderstanding of our decision from the last appeal and of the status of the case as it then returned to the trial court.

{¶ 23} In its 2016 grant of Ms. Luke's 60(B) motion, the trial court had found fraud on the court in Mr. Roubanes's income disclosures from 2008 and 2009 (while also finding that what it took to be Ms. Luke's claims of fraud against her as an opposing party were out of time). October 14, 2016 Decision and Entry Granting Plaintiff's 60(B) Motion at 4. Mr. Roubanes appealed, and Ms. Luke cross-appealed from the trial court's failure to find that what it had construed as claims of fraud against her should properly be considered as timely claims of further alleged fraud on the court. *Luke*, 2018-Ohio-1065, at ¶ 18, 19.

{¶ 24} We assessed the appeal under those component parts, examining both the trial court's finding of fraud on the court (pursuant to Civil Rule 60(B)(5)) and its denial (pursuant to Civil Rule 60(B)(3) of others of Ms. Luke's claims as time-barred because based on alleged fraud against her rather than on the court. *See Luke,* 2018-Ohio-1065, ¶ 14, 15. As to the former, we found that even if Mr. Roubanes had engaged in the alleged fraud, it would have been "the kind of fraud either rooted out through the adversary process or corrected post-judgment through the application of Civ.R. 60(B)(3)," *id.* at ¶ 27 ("[w]e conclude that Roubanes' false testimony [as we had assumed it to be, for purposes of argument] constituted fraud on Luke" not on the court); we therefore held that "the trial court erred in finding that Roubanes committed a fraud upon the court and granting Luke Civ.R. 60(B)(5) relief on that basis," *id.* at ¶ 31. In short, we had no need to consider whether the trial court had been justified in finding fraud, because even "assum[ing], without deciding, that the trial court correctly found that Roubanes engaged in fraud," such fraud would not have fit the (B)(5) category permitting adjudication under that part of the rule's more lenient time limits. *See id.* As to Ms. Luke's part of the appeal, and after separate analysis, we held that "the trial court did not err in determining that Roubanes did

not engage in fraud upon the court" with regard to the alleged conduct that the trial court had assessed as belatedly claimed fraud against Ms. Luke herself. *Id.* at ¶ 40.

{¶ 25} We therefore overturned that part of the trial court's 60(B) ruling that had gone against Mr. Roubanes, and we agreed with that part of the trial court's ruling that had gone against Ms. Luke. Consequently, the concluding sentence of our decision read: "We thus reverse the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, to the extent that it granted Luke Civ.R. 60(B) relief, and we affirm that judgment to the extent that it denied Luke Civ.R. 60(B) relief." *Id.* at ¶ 41. Our Judgment Entry following that decision said the same thing, and we assessed costs against Ms. Luke (who had lost both the appeal and the cross-appeal). March 23, 2018 Judgment Entry.

{¶ 26} But although Ms. Luke was left with no favorable judgment from her 60(B) motion, she now asserts that she is entitled to rely and to have the trial court rely on findings from that (anti-Roubanes) part of the trial court's 60(B) grant that we reversed. Her argument, in essence, is that while we reversed the *judgment* against Mr. Roubanes, we did not reverse the factual *conclusions* on which it had been predicated. *See, e.g.,* Appellant's Brief at 4-5. She miscomprehends the nature and extent of our earlier reversal.

{¶ 27} A party can appeal from certain decisions or orders, not simply from the rationale behind an appealable order. *Compare, e.g., Regester v. Regester,* 5th Dist. No. CA-7932, 1990 Ohio App. Lexis 2444, * 2-3 (June 18, 1990) ("it is axiomatic that this court reviews judgments, not rationales") (citation omitted). Here, our determination that the trial court had erred in finding that Mr. Roubanes had committed fraud on the court vitiated the 60(B) order against him (and therefore, as we found, made *moot* his other assignments of error, including his assignment (3) relating to the resulting revision of child support and attorney fee awards, *see id.* at ¶ 18, 41). Our ruling, that is, resolved in his favor the entirety of his appeal from the trial court's 60(B) determination. And with her 60(B) judgment therefore out the window, Ms. Luke is incorrect in arguing that the trial court was bound by the earlier underpinnings of its reversed judgment.

{¶ 28} The point is distilled in Ms. Luke's contention that the trial court erred "by failing to follow *res judicata* and law of the case." *See* Appellant's Brief at 9 (capitalizations and bolding deleted). Ms. Luke urges that because the 2016 trial court ruling recited that she had "proved that [Mr. Roubanes] committed fraud," *see, e.g.,* Appellant's Brief at 10

citing to 2016 decision at 4, the trial court in 2020 after our 2018 reversal was required "to accept the fraud that had been already proven," *id.* That view may explain, too, why Ms. Luke does not contend with the trial court's 2020 ruling (including that there was insufficient evidence of fraud) on its own terms. But res judicata—which applies to "subsequent actions"—relies on a "valid, final judgment * * * upon the merits." *See, e.g., Grava v. Parkman Twp.*, 73 Ohio St.3d 379, 382 (1995) (citing 1 Restatement of the Law 2d, Judgments, Sections 24-25 (1982) ). Here, the judgment on which Ms. Luke seeks to rely was reversed. Even were this a "subsequent action," the 2016 judgment would not provide a "valid" basis for invoking the principle. Law of the case principles, similarly, as applied to "all subsequent proceedings in the case," direct in part that "the decision of a reviewing court" should be followed at both the trial and appellate levels, *see, e.g., Nolan v. Nolan*, 11 Ohio St.3d 1, 3 (1984) (citations omitted): here, our decision reversed the finding of fraud on the court and affirmed that other alleged fraud should not be shoehorned into that category. Ms. Luke is entirely correct that a trial court " 'has no discretion to disregard the mandate of a superior court in a prior appeal in the same case.' " Appellant's Brief at 11 (quoting *Nolan*). Here, our decision was that Ms. Luke was not due Civ.R. 60(B) relief on the bases alleged: we reversed the 2016 judgment to the extent that it granted such relief and we affirmed it to the extent that it denied such relief. The trial court in 2020 followed and did not disregard that mandate.

{¶ 29} Ms. Luke does not here contest the trial court's implicit 2020 denial of her 60(B) motion in light of our earlier decision that she had not presented a true 60(B)(5) claim. With that part of the earlier ruling undone, the trial court was well within its authority to note that the record-keeping of both sides had been muddled, and to observe further that evidence of bank deposits, absent evidence of "expenses or exclusions," is not necessarily evidence of income. *See* July 7, 2020 Decision and Judgment Entry at ¶ 87. In any event, Ms. Luke does not challenge those findings head on, but instead clings to her position that fraud already was determined conclusively. Thus, Ms. Luke submits that "the Ohio Constitution requires there to be a remedy for every wrong." Reply at 3. That tack has at least two problems: it does not overcome the one-year time limit imposed by the text of Civ.R. 60(B)(3), and it does not respond to the analysis of the trial court's 2020 decision declining to find fraud at all.

{¶ 30} As a result of our earlier decision, the 2008 and 2009 orders on child support and attorney fees remained intact. 2018-Ohio-1065 at ¶ 32. Ms. Luke still wants them undone, in effect, asking for a "retroactive modification" of child support "back to Appellee's fraudulent misrepresentations," thereby probably also, she submits, making Mr. Roubanes "the child support obligor." Alternatively, she thinks that "the Court * * * likely should[] recalculate the amount of child support going back to the time of the parties' divorce. The recalculation could ultimately reverse any contempt finding * * *." Reply at 4-5. But the only basis that she provides for that approach comes from the reversed 2016 order, in conjunction with cases she cites on a " 'scheme to defraud the court' " or on ways to " 'prevent the perpetuation of fraud,' " or "to cure a party's fraud." *Id.* at 6-8 (citations omitted). The earlier trial judge "correctly ruled in October 2016" that Mr. Roubanes had committed fraud, she insists, and that should be the end of the analysis. *See id.* at 9 (adding that the current trial judge erred in not finding fraud "as held by the predecessor trial judge"). Again, however, simple invocation of a reversed trial court decision does not establish that the trial court later abused its discretion in not finding the fraud Ms. Luke perceives. "All remaining issues flow from [Mr. Roubanes's] initial fraud," she contends, *id.* at 17, again without establishing that the trial court abused its discretion when it did not agree with her that fraud had been established.

{¶ 31} Ms. Luke's briefing of her first assignment of error wanders at times rather far afield from the assignment itself. (She argues, for example, that "law of the case and *res judicata*" principles require that a trial court decision from April of 2013 to the effect that the parties had not been underemployed before that point must mean that Ms. Luke could not have been underemployed from 2014 on; the logic of that position is not apparent on its face, but she does not elaborate as to why that must necessarily be so. *See* Appellant's Brief at 27 (citing *Nolan*); Reply Brief at 11 (reiterating that findings for years through 2012 must govern determinations from 2014 onward). Her first assignment is couched in terms of "previously" determined fraud, but even if we were to venture beyond that proposition for these purposes (and we are not so inclined), we also see no abuse of discretion in the trial court's careful review of such matters as Ms. Luke's employability or the other items that Ms. Luke attempts to weave into her first assignment. Moreover, the trial court's weighting of testimony and its determinations of witness credibility were within its fact-finding purview, and appropriate. We overrule Ms. Luke's first assignment of error.

{¶ 32} Ms. Luke's position that early fraud by Mr. Roubanes should be assumed as a background fact spills over into argument on the other assignments of error. Under her second assignment, for example, relating to claimed abuse of discretion in child support calculation, Ms. Luke recurs to her central theme of fraud: "When combined with [Mr. Roubanes's] fraud in forcing Mother to be named the obligor, then taking the children and holding them for 23 days to establish his possession of them, then after securing a child support order obligating Mother to pay him child support based on his fraudulent misrepresentations of income, followed by his failure to exercise his parenting time, instead leaving the children with Mother nearly full time, equity demands that this Court act to right this wrong * * *." Appellant's Brief at 44. For the reasons outlined above, that argument—even in tandem with Ms. Luke's inquiry as to why a downward deviation would be appropriate for 2019 but not for earlier years, *compare* Appellant's Brief at 40 *with id.* at 42 (noting precise calendar notations "[s]tarting in 2019"; "[s]tarting in March 2019, each parent had one child for 24 days, with [Mr. Roubanes] only having both for seven days," etc.); *see also* July 7, 2020 decision at 4 (noting change in statute regarding child support determined after March 28, 2019)—does not reflect an abuse of discretion. *Compare also*, *e.g.*, Appellant's Brief at 41-42 (suggesting that trial court was required on basis of Ms. Luke's testimony to find that Mr. Roubanes rather than the children ended mid-week visits with Ms. Luke) *with* July 7, 2020 decision at ¶ 225(d) (trial court details why it found Ms. Luke's testimony on this subject not credible). We find no warrant here to second guess the 2020 trial court's determinations as finder of fact. Nor does Ms. Luke direct us to any particular record citation that would cause us to cavil at the trial court's determination that "[t]here is no evidence that [Ms. Luke] qualifies for a resident child adjustment" in connection with her foster child. *Compare* July 7, 2020 decision at ¶ 199 *with* Appellant's Brief at 45 and Reply Brief (no citation to any such evidence in record). We overrule Ms. Luke's second assignment of error.

{¶ 33} In connection with her third assignment of error, Ms. Luke urges that the trial court abused its discretion when it assessed attorney fees against her in connection with her last unsuccessful appeal and the 60(B) motion from which it arose. *See* Appellant's Brief at 46; Reply at 18. "Appellant proved that he committed fraud," she tells us yet again. But she lost the appeal (with appeals court costs imposed) and lost the 60(B) motion: we see no abuse of discretion in awarding attorney fees there. She also was unsuccessful in the

West Virginia action she initiated, *compare* Appellant's Brief at 46; Reply at 18-19. The trial court did not abuse its discretion in awarding those limited fees. Nor does casting her presumption of fraud as a matter of "the equities in the case" or further repeating what should happen "when one party commits fraud" enhance her attorney fee arguments. *Compare* Appellant's Brief at 47; Reply at 19. We overrule Ms. Luke's third assignment of error.

{¶ 34}   Nor do we find that the trial court erred in its findings of contempt regarding Ms. Luke's failure to pay the longstanding $806.12 balance in previously ordered attorney fees and to pay child support as previously ordered. We note that our decision and our judgment entry reversing the 60(B) order came on March 23, 2018, and the contempt findings at issue did not issue until more than two years later. Ms. Luke is correct that the amount of attorney fees then owed was small, but that fact does not excuse non-payment and indeed cuts against Ms. Luke's argument that she did not have sufficient time to pay. *Compare* Appellant's Brief at 48; Reply at 20-21. And Ms. Luke's child support arrearage as of May 1, 2020 amounted to more than $30,000; contempt was appropriate on that score, too. We overrule Ms. Luke's fourth assignment of error.

{¶ 35} Having overruled Ms. Luke's four assignments of error, we affirm the thorough judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations.

*Judgment affirmed.*

KLATT and BEATTY BLUNT, JJ., concur.

NELSON, J., retired, of the Tenth Appellate District, assigned
to active duty under the authority of the Ohio Constitution,
Article IV, Section 6(C).

_____